Good morning. May it please the court. My name is Jane Volz and I represent Hammer & Steel Inc. and I'm joined here today by David DeReek, my co-counsel. We're here on cross appeals and at first blush they appear complicated, but this case is relatively very simple. Everything in this case can be addressed by just looking within the four corners of the rental agreement that the parties executed and entered into a bargain for agreement that addresses all of the issues. That sounds good. Go ahead. Okay. So first the court has issued an order to discuss the Danics case and the application of the economic loss doctrine to this case. And if it's okay with you I'll start with that, the economic loss doctrine. And in this case the issues here are the poster child for the application of the economic loss doctrine. We have two commercial entities, highly sophisticated entities, who entered into an unambiguous contract. It's not unconscionable. It's fully integrated. It describes all the rights and liabilities and the allocation of risk between the parties. And everything that Graham claims here is addressed in the agreement. The damages they claim have been specifically excluded. Graham and Hammer & Steel have entered into this same type of agreement on numerous occasions prior to this rental agreement. Everything is defined in that agreement. And that's what the economic loss doctrine is for. There are no tort claims here. This is purely a contract claim. Well, that's not the way I understand the economic loss doctrine. Yes, it says the reason for the economic loss doctrine is we ought to let the UCC apply. But the economic loss doctrine here has to be a loss of the product itself. Now, I was on Danix, and of course what we had was paint on a surface. And the paint was there, and that was the damage rate on what it was. But here we've got an auger that falls in the hole, and the hole does not belong to the contractor. The hole belongs to the city. And so it's a different piece of property. And the economic loss doctrine never applied to another piece of property or damage to others. What was the name of your company again? Hammer & Steel. Well, the Graham Construction Company had to fix it because they had a contract with the city. But I think it's a close issue. But right now I'm not convinced that the economic loss doctrine applies. But you're saying it applies in the way you're saying it. You don't need it because if the contract provisions apply to this agreement, then you're in the clear. But there's some fact issues there on whether or not the agreement was really made even before you issued that invoice with all those terms on it. And that's a pretty good issue to look at. But I think that was – didn't that go to the jury? Yes, and the jury determined there was a contract and that Graham breached the contract and that Hammer & Steel did not breach the contract. And the jury ultimately awarded Hammer & Steel everything they asked for under the rental agreement, which is all the rental charges that weren't paid. Well, you got the rental charges. Yes. But the other place got their damages for what they had incurred in the new hole, to make a new hole. Graham. Yeah, Graham seeks to have the damages for the new hole. And if I may, Judge Bright, in your discussion about damage to property and the damage of the hole, it's the same as the Dannix case. In the Dannix case, you had paint that delaminated. There was no damage to the property. In this case, Graham has never claimed there was damage to the property. They've never claimed moving the hole was damage to property. They just claimed they want the cost of moving the hole. And just like in Dannix, even if there was damage to property, the property was owned by the city. Well, that may be a distinction. Because you say it's a distinction without a difference. A distinction without a difference. And that's a good question. But right now, I think there's a question whether Dannix applied. But go ahead. Okay. Well, in this case, what happened was the drill broke. I know that. The Kelly Bar broke three times. They're not asking, saying that the drill damaged any property of any kind. And just the other points, I mean, there's no special duty. There's no fiduciary duty between the parties. There was no intentional tort. And, frankly, Hammer and Steel had absolutely no control over Graham's operation of the drill. If Graham wanted some guarantee, which is what they wanted, they asked for reformation of the contract to include a guarantee that this drill was going to complete the project. Nobody would ever do that unless it was a subcontractor. If Graham really wanted a guarantee that this hole was going to get finished, they would have hired a subcontractor and self-performed the project. And another point here is – Well, can I just follow up on Judge Wright's question and see if I can understand how the economic loss doctrine works or at least how you think it works. In this case, as I understand it, economic loss doctrine applies to damages that, in this case, Graham Construction suffered as a result of having to re-drill a second hole. That's your position. Similar to, in Dannix, having to repaint the buildings when it became delaminated. Is that right? Yes. Now, to follow up on what Judge Wright was asking, though, if some small part of that damage was damage to the city-owned property – let's say they had to fill in the hole they dug, and that cost them $10,000. That wouldn't be covered by economic loss, though, right? Damage to third-party property is not covered by economic loss. No. If the city went after Hammer and Steel, they may arguably have a tort claim in that instance. Even if they didn't go after them, if just Hammer and Steel felt that that was part of their contractual obligation to the city, it was if the first hole didn't work that they had to spend whatever money there was to return the land to its prior condition. Would that be covered by economic loss? Well, it depends if you consider it a property damage or not. Moving the hole is a contractor doing additional work, but it would depend if there was property damage. And I wouldn't consider that property damage having to drill a hole in one spot and then move it to another spot. I understand that. I'm talking about if you have to – if as part of the drilling of the first hole there was some damage to the city's property, and that's what – I'm just trying to slice it here, and maybe it's not that important. Okay. The damage to the city's property, if there was any, would be covered. The cost of redrilling a second hole would not be covered under economic loss, right? Well, Graham has no standing to bring those claims because they don't own the property. The city does. So Graham would have no standing in any event to bring any type of claim for moving the hole. So the economic loss doctrine isn't applicable in my mind in that sense. Does that answer your question? I'm not sure. Okay. Well, I think what he's asking is if there had been a cost to fill in the first hole, so to speak, and the city was trying to recover that from Graham, and maybe Graham tried to then recover it from you, would the economic loss doctrine apply to that? It would always apply to Graham's claim against Hammer and Steel because of the contract, unless, like I said before, it's considered property damage. Then it would be else – The city's claim to refill the hole may well be property damage, wouldn't it? Yes. It could be. I mean, I would say it wouldn't be, but it could. I mean, I guess it could be because it broke and the auger was at the bottom of the hole and they had to fill it in. I guess you could arguably call that property damage. Yeah. I mean, you now have this hole that's potentially where somebody could get injured, and the city is going to say, hey, we need that filled. That sort of thing could well be property damage. Yes, but that's not what the claim is here. I mean, everything Graham is asking for here is in the contract, and Hammer and Steel specifically excluded delay costs. Any construction costs related to – On that issue, as I understand Missouri law, even though you have a contract that says the contract incorporates all the discussions, no prior discussions or representations are to be considered, everything is within the four corners of the contract, Missouri still has an exception to that, as I understand it, that if you negligently misrepresented – if the contract was induced by negligent misrepresentation, those sort of boilerplate, for want of a better term, language in the contract that says all warranties are excluded, all representations are incorporated, or you cannot rely upon any oral representations. Even with that type of language, as I understand it in Missouri law, if you misrepresented the product, you're still a cause of action. Am I wrong? I would disagree with that. It depends. It's kind of a nuanced issue. If the negligent misrepresentation goes to the character of the product, or whatever they're leasing, like here the drill, then it does not – they can't use that as an end-around to bring a tort claim. And that's what Graham is trying to argue here, that the economic loss doctrine does not apply because they claim that – Let's forget about the economic loss. I'm talking about your argument that everything is within the four corners of the contract. Yes. I'm switching gears here. You started by saying everything is within the four corners of the contract. What I'm saying is I understand that under Missouri law, if there was negligent misrepresentation that induced the contract, then there's an exception to that sort of normal four corners rule. You're saying exception outside the parole evidence rule? Yes. And that's what Judge Hamilton – she allowed that to go to the jury, those issues. She allowed them to determine whether or not the contract was enforceable. What it comes down to, it seems to me, is this. If the economic loss doctrine applies, you win the case, period. Yes. If it doesn't apply, it's possible that that's separate and distinct from the contract, and they win on the economic loss doctrine and the cost of what it cost them to fix up that hole. And it's true that the city didn't make the claim, but in a way, they take over sort of the city's claim in a way. I'm not saying that's so, but that's a possibility. But if the economic loss doctrine doesn't apply and you still win on the contract, then the case gets affirmed. Well, Your Honor, there are many other issues that preclude Graham from the damages on their negligent misrepresentation claim, legal issues that require – that I argue, of course, would require reversal of the judgment. And one of the – I think the biggest issue is the Renaissance leasing case and the independent investigation. The what? Leasing case, Vermeer, Renaissance leasing versus Vermeer. And in that case, the issue – one of the issues was Missouri's independent investigation rule. And what that is is if a party enters into a contract and prior to – Graham's claim here is that the drill didn't work because they're arguing that the big 14-foot tool was too big for the drill rig and that's why it didn't work, and therefore, they should have all these damages. Well, under this independent investigation rule, the courts say that if Graham made an investigation prior to entering into the contract, then they can't make the argument for negligent misrepresentation.  Was that submitted to the jury? Was – I'm sorry? Wasn't that a defense to – a defense to their claim for damages or not? This is a – I don't – go ahead. This is a legal issue. This is a legal issue relating to reliance. And we talk about that – Your claim that there was no reliance as a matter of law. Yes, there's no reliance as a matter of law for several reasons that are – Did the court rule that there was reliance in this case or wasn't it presented to the court? It was presented to the court in the – Pardon me? It was presented to the court in all of the Rule 50A, 50B motions. That as a matter of law, there is no reliance on the representation. You mean it was presented to the court after the jury came out? Prior – yes, yes, pre-verdict. Pre-verdict. Pre-verdict. The court ruled against it. The court ruled against it and allowed it to go to the jury. But in this case, just – Graham had leased the same drill rig on a prior job, had the specifications that talked about the width of the 14-foot tool or the width that you could put on the drill. They had all that information. Quint McDermott, the person who the alleged representation was made to, had went to Germany to look at drills. So there was a tremendous amount of activity upon Graham to investigate the capabilities of the Sani drill rig. But on the other hand, during the – when this rod broke, your company arranged to replace that rod, I think, twice, didn't they? Yes. So, I don't know, was that supposedly under a warranty of some kind? Yes. Well, under the contract, Hammer and Steel was required to repair or replace broken equipment. They agreed to do that. That was in the contract. And when the Kelly bar broke the first time, they went out there and they cannibalized another drill, took another $45,000 Kelly bar and put it on the drill so Graham could continue with their project. And the second time it broke, they replaced it again. And the third time, they took it off the project. And they were required to do that. They were required to repair or replace as part of the contract. What remedy do you want from us, assuming that, say, I know you want the economic loss doctrine to bar their recovery, but what about your claims? Are you making any other claims? No, we're asking the court to affirm all of the other claims. There are only two other claims. The jury awarded Hammer and Steel everything they wanted on the breach of contract, so we would like that affirmed. And then the court, on an equitable claim, granted judgment in favor of Hammer and Steel for the auger that was lost in the hole. That was lost, okay. Yep. So, we're asking, of course, that that be affirmed. So, you're satisfied with what you got out of this case? Yes. But you don't want to give the other side anything? Yes. Okay. Yes. And I'd like to reserve. That's being very candid about it. Yeah, yes. That's what we want to know. Okay, yeah. I'll reserve the last few minutes for rebuttal. Thank you. Very well. Mr. Collins? Good morning, Your Honors. My name is Matthew Collins. I represent Graham Construction Services. I want to dive into the Dannix case right away. I don't think you have to. I think that case is easily distinguishable from the case before you for four reasons. First, I want to – Are you talking about Dannix? Correct, Your Honor. First, I want to mention the notion of morality in the law, and I'll get back to that. But first, Judge Bright, you sat and listened to the attorney for Sherwin-Williams and read his briefs, and he made it clear that Sherwin-Williams does not give advice about the paints it supplies. It has a specification, it manufactures a paint, and it gives it to the customer. And the customer takes it and puts it on whatever surface it needs to, and if it doesn't work, well, we have a remedy under the contract for a limited warranty. That's different than what went on here, Your Honors. There is a reason the testimony in this case centered on August, September, October, and November of 2009 before the December 2009 contract was signed. Graham provided the soil borings, the size of the hole, and the depth to Hammer and Steel. They came back not just with a drill, but an entire drilling system that they said would work. They did this after advertising on their website that says, Our experienced sales staff will carefully analyze the details of your requirements to match the right equipment to your job. Mr. Lawrence, the owner and vice president of Hammer and Steel, and Mr. Maxa, the salesperson, confirmed that they knew Graham was relying on what they were telling them. They confirmed in testimony that Hammer and Steel expects Graham to rely on their expertise to recommend appropriate drilling equipment. Mr. Lawrence testified Graham was entitled to rely on the representations that Mr. Maxa made. That was before the jury. That's why they determined Graham's reliance was reasonable, Your Honors. I've got to ask one question. Before the actual invoice with all these boilerplate provisions were in there, had there been any sort of oral understanding that Hammer and Steel would supply the equipment to Graham? Mr. McDermott testified as such, Your Honors. And I will give you the facts. Mr. McDermott testified to that very proposition. Who's McDermott? Mr. McDermott. He's the one who signed the contract on behalf of Hammer and Steel, or Graham. So he said before they even got the invoices, they had an agreement. Yes, and let me explain why. Was it written or just oral? Oral. But let me explain why. Okay, Your Honor? First, relying on the representations, Graham submitted a bid that incorporated the costs that Hammer and Steel identified. And they submitted that bid to the city of Parshall. Now, they didn't win the bid, but they used the same numbers to get the work as a subcontractor. So they relied on that information, submitting a bid to the public owner, and signing a contract with ICS. Now, that satisfies the concern under the economic loss doctrine that the misrepresentation induced conduct of Graham outside and collateral to this contract. Second. You started by saying that in Danick's, Sheridan Williams' brief said that we don't recommend paint. You rely upon the literature. But that's not what Danick says. The Danick's case said that Sheridan Williams' employees recommended a specific type of paint for this specific application, and that for purposes of the appeal, they were assuming that Danick's relied upon Sheridan Williams' expertise and recommendation. Now, how is that different from what we're talking about here? Because it was post-contractual. That was the third type of paint that Sheridan Williams supplied under the original contract. They were satisfying their limited warranty remedy by supplying additional different kinds of paint when the first one didn't work. These are pre-contractual negotiations, Your Honor. Danick's was after they had signed the contract, after they were out there doing the work. Now, not only did Graham use the numbers and the recommendations supplied by Hammer and Steel in its bid to the owner, it went out and hired engineering partners, an engineer, to design an earth retention system and a drill platform that would meet the requirements of their equipment. Not only the drill, but this enormous 14-foot over-reaming tool that had to have the right clearances to dump the dirt after it was drilled. They spent $12,000 on that engineer in September, in October. Then they hired a driller to operate this specific type of drill. Then they went up to this site, they mobilized their men, they built the drill, the retention system, the drill platform that was custom designed for the equipment that Hammer and Steel is supplying. They purchased the over-reaming tool, which is separate from the rental agreement for the drill rig. That was another $40,000. Those are the conduct that was induced by Hammer and Steel's representation, which is outside of and collateral to the rental agreement. The point I'm trying to make is that this case clearly is distinguishable from the facts in Danix. How about Bruce Martin construction? Is it distinguishable, is your claim distinguishable from the one in that case? Yes, because, see, and that's the distinction here, Your Honors, is neither Danix or Bruce Martin talk about this as the negligent misrepresentation, as an inducement claim. Look at the opinion in Danix and Bruce Martin. The word inducement doesn't come up. When you look at the case law under the economic loss doctrine, you look at when were the misrepresentations made. Here they're all pre-contractual. To your point, Judge Malloy, I think Judge Hamilton got it right when she recognized under Missouri law you can't hide behind an integration clause when you have an inducement claim based on misrepresentations. I would posit to you, Your Honors, in trying to see where Missouri law would go on application of the economic loss doctrine to inducement-type claims involving misrepresentation, just look how they treat inducement claims with regard to the parole evidence rule. They have two exceptions, fraud and negligent misrepresentations in the inducement. And why is that? Because you cannot create a safe harbor for fraud. Well, nobody's claiming fraud here. Well, Your Honor, negligent misrepresentations, fraud, misrepresentations, Your Honor. They misrepresented what they said they believed to be true. And in September, at the same meeting, when Graham goes to the engineering partners meeting to design this platform, Todd Maxa, the sales representative at Hammer & Steel, attends, so he can tell them all about the dimensions of this drill and all the other equipment. Mr. Maxa. Let me ask you one question. Sure. I know all about this representation, but any time before the invoices came with the boiler break, did Hammer & Steel ever say, write anything and say, we confirm we're going to take care of your requirements or anything of that kind? When they submitted a bid in August 25, 2009, they submitted a bid to us. They submitted a bid to the third party. Submitted it to us so we could rely on it to incorporate it into our bid to the owner. Yeah, they put it in writing. You did have a bid for that. Yes. And without any boiler plate. And it didn't mention in the bid that, you know what, this bid is subject to our standard terms and conditions. Didn't say that. Yeah, but, of course, you didn't get that contract at the time. You got it through the original successful bidder. Yeah, but we relied on the same information. And we didn't get the signed contract until our men were mobilized on site. The platform was constructed and they were sitting on site waiting for the drill to arrive. And that's when Hammer & Steel says, nope, we can't send it to you until you sign this. We didn't have an opportunity to negotiate. We are losing money with people on site. But getting back to my point about here you have active negligence, Your Honor, and that's what the jury found. On September, at the September meeting with the engineer, Mr. Max is there. At that same time, that day, he receives an e-mail from the vice president and owner of Hammer & Steel, Bob Lawrence. The e-mail says, you know what, we're concerned down here in St. Louis about whether this drilling equipment can do the job. You better go and contact Sanny, the manufacturer, and make sure, based on the weights, the soil conditions, and everything else, that this thing can work. Mr. Max responds, we'll do, boss. Guess what? They never did. Mr. Max admitted in his testimony. Was the Economic Loss Doctrine submitted to Judge Hamilton? Yes, Your Honor. And she rejected it? She didn't. She said she needed further briefing, and then ultimately she denied the motion on the Economic Loss Doctrine. She issued a one-page order denying the post-trial motion. She didn't provide anything. She didn't write anything on that? No, Your Honor. Okay. There was an Economic Loss Doctrine posed in the pretrial motions? In a motion in Lemonnier, I believe. Yes, there was. Yeah, they did. Now, so we have three, four distinctions between this case and Dank's. First, Hammer & Steel offers the guidance. They advertise it. They intend for their customers to rely on the guidance they're providing. Second, these are pre-contractual inducement misrepresentation statements by Hammer & Steel, that a jury of 10 Missourians found that Hammer & Steel reasonably relied upon. Three, the conduct induced by Hammer & Steel caused Graham to take actions that were outside and collateral. Two, the rental agreement. Three, there has to be, or excuse me, four, there has to be some morality in the law, Your Honors. Someone can't induce you, based on misrepresentations, to go and sign a contract and then come back and say, no, first, the parole evidence rule doesn't allow you. Second, oh, if that doesn't work under Missouri law, then the economic loss rule should apply. But the economic loss rule is based on equal bargaining power. Here, Graham didn't have equal bargaining power because it was induced based on misrepresentations. That's what Mr. Lawrence admitted. He admitted that in order for two parties to have a fair contract, they have to have equal bargaining power. Graham was induced by Hammer & Steel to sign this contract based on misrepresentations. Therefore, Graham was not at the equal bargaining table with Hammer & Steel. Well, you haven't answered the question that it seems is pretty important. The economic loss doctrine doesn't apply to the very article that you buy. Very often, there's no equal bargaining power. I haven't seen that talked about in those cases that I've read. Of course, all the cases are in the Intermediate Court of Appeals, not the Missouri Supreme Court. The only exceptions that are there are damage to property of others or outside. I can't remember the other one. I can't remember. There's another exception, too. I was thinking that this could be rationalized on what they had to do was dig a new hole. The hole that they had couldn't be used, which was really not their hole. It was the city's hole. People don't own that property. I hear what you're saying, Your Honor. I'm not sure. I mean, Graham's damages resulted from the failure of this drilling system. Which I know. They had to abandon that hole. I mean, there's an auger 90 feet at the bottom of that hole. Is that property damage to the city of Parshall? Probably. But, you know, the city of Parshall hasn't said you have to owe us money because you left this auger at the bottom of this hole. I mean, I'm not sure that analysis distinguishes Danix or recognizes the cause of action of negligent misrepresentation and the inducement. I would suggest, Your Honors, you look at the Supreme Court of Kansas' recent decision. It was published on July 26, 2013. It's 305P3-622. 305P3-622. That's in Kansas? Is that in your briefs? No, it's not, Your Honor. You might want to submit a 28-J, then. I will, Your Honor. In that case, the Supreme Court of Kansas is tackling this very issue. They've got a negligent misrepresentation inducement claim, and they're trying to figure out what we do with the economic loss doctrine. They don't want to destroy the economic loss doctrine. They recognize its importance. And I do, too. But they recognize that the Restatement Second, Section 552, that's the negligent misrepresentation claim, is an independent duty imposed by law that when you're in business, you advertise yourself as someone who's experienced and knowledgeable about specific tasks, and you go out to other businesses and you have your clients, and you make these representations, well, you better make sure they're right. Because what happens? A party like Graham relies on that and not only signs the contract with you, but then goes and submits a bid to the city of Parshall and eventually signs the contract to do this work, because you said you could supply drilling equipment that would work. And that's what the Supreme Court of Kansas is looking at. But when you subsequently sign a contract that assigns the risks by various warranty provisions, why shouldn't that govern? Because the point is what the Supreme Court of Kansas says and what Danix recognizes is that it prevents tort law from altering the allocation of costs and risks negotiated by the parties, because it permits the parties to specify the terms of their bargain and thereby protect themselves from commercial risk. That all goes away when you have negligent misrepresentations in the inducement, because you alter the bargaining process. No longer are the parties looking at each other in the eye, but here Hammer and Steele's made misrepresentations that Graham doesn't know about. And it only signs the contract because it's under the false impression that those misrepresentations are accurate and true, because Hammer and Steele has advertised it and told you, rely on me. We'll take you out to Germany. We'll show you all the drills we have. We are the leading expert in the country in supplying this type of equipment. When you make those misrepresentations, well, you better be right about what you're saying. And that's what the restatement says. And that's what the Supreme Court of Kansas said. And importantly... You got any support for that on the Supreme Court of Missouri? I would point to the parole evidence rule, Your Honor, the integration clause that says, you know what, we don't let people lie and then hide behind their contracts. And that's the slope you're on with the economic law doctrine in this situation. If you let that doctrine apply in this case, you're creating a safe harbor for parties to misrepresent things and then stand behind the contract. Missouri doesn't allow it under the parole evidence rule, but this Eighth Circuit is going to say it's okay because we can apply the economic law doctrine in Missouri, and therefore your misrepresentations that induced every party to sign this contract doesn't work. How would you distinguish, again, your case from Danik's? Four reasons, Your Honor. Okay, I heard those reasons. I understand you. That's the nature of the transaction, the initial nature and the representation. You know, there was that representation in Danik's too. Post-contractual, Your Honor. But this is not the only basis for Graham's appeal. If you do find the economic law doctrine applies, which I think is a wrong decision, we are also appealing the judge's decision on the application of equitable estoppel. Look at the elements of equitable estoppel. They virtually mirror the jury's findings, factual findings. So you're telling me that a party can— Before we run out of time, can I switch gears? Because you also made a jury instruction argument on a couple of instructions. It seemed to me that many, if not all, of your arguments were directed at the amended instructions, which were withdrawn and replaced and superseded by the second amended instructions. Am I wrong about that? I'm sorry, I didn't— The arguments you made in your brief, it appeared to me to be directed at the amended instructions, which were withdrawn. Well, I don't think they were withdrawn, Your Honor. It sure seemed like it from what I read. The jury instruction proceeding went like this. Judge Hamilton said we need a Missouri-approved instruction. Well, we don't have a Missouri-approved instruction for mitigation of damages or equitable estoppel. It was clear that Judge Hamilton would refuse to create her own jury instruction. If there wasn't an MAI, she wasn't going to instruct this jury, and that is clear error. We submitted jury instructions. They weren't withdrawn. She asked us to rewrite them. We came back the next morning. She said, you know what, we're not instructing the jury on equitable estoppel and mitigation. We submitted revised instructions hoping to comply with it. She didn't file them. Both Hammer and Steele and Graham made a motion to have those instructions filed, but the clerk for Judge Hamilton said, well, it's on appeal. We can't file those. We never withdrew the request, Your Honor. And I know I'm out of time here. I would just say that if you look at the obligations for mitigation, clearly we were entitled to an instruction on mitigation. They knew the drill wouldn't work. And secondly, the judge should apply to equitable estoppel to their contract claim. You can't induce contract on misrepresentations and then come back and say, you owe me the money on that because it didn't work. Thank you, Your Honor. Thank you, counsel. Ms. Bowles, what about this argument that Danix is distinguishable because this is a pre-contract inducement? Danix is not distinguishable. In the case of Danix, Graham states that, well, because they had a contractual relationship, it's distinguishable prior to recommending the dry ester paint, the paint that failed. What happened here was we don't even know if there was a written contract, first of all. The record's not clear. I don't know if there's a written contract that they had prior to using the third paint or not. But in the third paint, and I spoke with the attorney for Danix, I mean for Sherwin-Williams, they recommended the paint, then they bought it. So it was the recommendation, then they bought it. Just like here, recommended a couple of drill rigs, they rented the Sani drill rig. Then they entered into a contract. Bruce Martin Construction is completely the same as this case. In Bruce Martin, in their complaint, they said, but for the defendant's negligent misrepresentation, plaintiff would have never purchased the defective equipment. This is the same case. In Bruce Martin, representation was made prior to entering into the contract. So they're the same. Can I ask just one real quick question? I assume that there is nothing currently pending in the Missouri Supreme Court that might shed any light on this, as far as you know. As far as I know, there is nothing. There's nothing. And I just want to add one more point. The representation that the drill would do the job, that's the only representation that was set forth in the trial, that the drill would do the job, is not collateral to the contract. Therefore, the economic loss doctrine applies here and bars this claim. And I wanted to just tell you where the renaissance leasing case is. It's cited on pages 12, 13, and 15 of Hammer and Steele's final brief that discusses the independent investigation rule, should this court determine the economic loss rule doesn't apply. There is no reliance. I want to ask one other question. What was the basis for, I mean, this is a contract case. What's the basis for post-trial, Judge Hamilton giving you that money for the auger that's buried? It was under the contract. Graham was required to be responsible for any risk of loss of the equipment, including the auger. So that's really a contract claim, not an equitable claim. Well, the court determined it was an equitable claim because we were also asking for return of the auger, which is an equitable claim. So she ultimately decided on an equitable issue. She gave us that judgment. But the auger has never been returned. It's at the bottom of a bunch of dirt, I assume. Yes, which was Graham's decision to fill up the hole. That's Graham's decision. Hammer and Steele had no control on that job. And I just want to make one point about the e-mail Mr. Collins brought up that was prior to entering into the contract that he said Bob Lawrence wrote, saying that you better check out this drill rig. That e-mail only had to do with the tipping capacity of the drill and whether or not it would be too heavy with the 14-foot tool filled with dirt and it would tip over. It had nothing to do with the capabilities of the drill rig. Very well, Miss. Your time has expired. Thank you. Thank you. We appreciate counsel's argument today, and the case will be submitted, and we'll issue an opinion in due course. Thank you. Mr. Hagan, would you call our next witness?